704 F.2d 1254
 227 U.S.App.D.C. 125
 CITIES OF AITKIN, ET AL., Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Minnesota Power & Light Company, Intervenor.
CITIES OF BIWABIK, ET AL., Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Minnesota Power & Light Company, Intervenor.
 Nos. 80-2375, 80-2376.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 19, 1981.
Decided March 5, 1982.
 
 Petitions for Review of Orders of the Federal Energy Regulatory commission.
 Reuben Goldberg, Washington, D.C., for petitioners. Channing D. Strother, Jr., Washington, D.C., also entered an appearance for petitioners.
 Andrea Wolfman, Atty. F.E.R.C., Washington, D.C., with whom Barbara J. Weller, Asst. Sol., F.E.R.C., Washington, D.C., was on the brief, for respondent.
 Robert T. Hall, III, Washington, D.C., with whom John R. Schaefgen, Jr. and Johnson A. Salisbury, Washington, D.C., were on the brief for intervenor.
 Before MacKINNON, ROBB and EDWARDS, Circuit Judges.
 Opinion PER CURIAM.
 
 PER CURIAM:
 
 1
 These cases involve two increases sought by the intervenor Minnesota Power & Light Company (the Company) in the rates it charged its wholesale electric power customers in 1976 and 1977. Petitioners, fourteen Minnesota municipalities[1] and one electric power cooperative which purchase wholesale electricity from the Company, seek review of three 1980 orders of the Federal Energy Regulatory Commission (the Commission) approving those increases. For the reasons set forth below, we affirm in part and reverse in part, and remand the cases to the Commission for further proceedings.
 
 
 2
 The Commission has jurisdiction over wholesale electric power rates pursuant to section 205 of the Federal Power Act, 16 U.S.C. Sec. 824d (1976) (Act). In July 1976, the Company filed with the Commission a rate increase amounting to some $1.9 million; subsequently, in June 1977, the Company sought a further increase of approximately $2.4 million. These increases are the subject of the present proceedings.
 
 
 3
 Pursuant to section 205(e) of the Act, 16 U.S.C. Sec. 824d(e) (1976), hearings were held on the proposed rates. The Commission, on review of the initial decisions of the two Administrative Law Judges (ALJs) who conducted the proceedings, affirmed in part and reversed in part in its Opinions 86 and 87.[2] Petitioners challenged all rulings adverse to their position on petitions for rehearing, and obtained favorable rulings on two issues not here involved. Opinions Nos. 86-A and 87-A (consolidated) (Sept. 15, 1980) (J.A. 133). Petitioners now seek review of the remaining adverse Commission rulings in these three opinions. The petitions involve four issues: (1) whether the Commission properly allowed the Company to increase the rate of depreciation claimed for its generating equipment; (2) whether the Commission properly ruled that costs of subtransmission facilities did not have to be "rolled into" the costs of the Company's transmission facilities; (3) whether the Commission properly allowed the Company the same rate of return on its wholesale service as it is allowed on its business as a whole; and (4) whether the Commission properly rejected a study conducted by petitioners relating to the Company's working capital allowance.
 
 
 4
 With respect to the first three issues, we find that the orders of the Commission are supported by substantial evidence, were the product of proper administrative procedures, and cannot be deemed arbitrary and capricious. With respect to the final issue, however, we are unable to discern any basis for the Commission's rejection of petitioners' "lead-lag" study. Because this aspect of the Commission's rulings was thus arbitrary and capricious agency action, we reverse the Commission on this point and remand these cases to it for further consideration of the working capital allowance question.
 
 1. Change in Depreciation Rates
 
 5
 Petitioners attack the Commission's ruling that the Company adequately justified increases in the rate of depreciation claimed for steam and hydraulic generating equipment. These increases permitted the Company to charge a greater amount to operating expenditures, and thereby to increase the rates it charged to its customers.
 
 
 6
 Petitioners first argue that the Commission failed to enforce its own regulations (18 C.F.R. Sec. 35.13(a) (1977)) requiring utilities to disclose their reasons for general rate increases, and failed to comply with section 302(b) of the Act, 16 U.S.C. Sec. 825a(b) (1976), which requires the Commission to notify the state regulatory agency with jurisdiction over the utility involved of any pending decision on depreciation rates. Petitioners claim that these procedural lapses were prejudicial, presumably because they denied petitioners (as well as the Minnesota Public Service Commission) an opportunity to challenge before the Commission the rate increases based upon increased rates of depreciation.
 
 
 7
 We reject this claim on the ground that both petitioners and the state agency had actual notice of the change in depreciation rates. Petitioners' petition to intervene in the ratemaking proceeding before the Commission, filed only 20 days after the Company proposed the increase, included an attack on the depreciation rates claimed by the Company. J.A. 232. The state Public Service Commission also had actual notice of the proposed depreciation rate changes prior to the hearing before the Commission.[3]
 
 
 8
 Second, petitioners contend that there was no evidence in the record supporting the Company's claim of reduced equipment service life. Assuming arguendo petitioners' standing to object to the adequacy of the information supplied by the Company to the Commission, the Company submitted all information required by the Commission's own regulations. See 18 C.F.R. Sec. 35.13(b)(4)(iii) (1977). This fact leads us to conclude that the Commission's decision has adequate support in the record and, when coupled with petitioners' failure to pursue the issue in the proceedings before the ALJ or the Commission, causes us to conclude the point against petitioners.
 
 2. Calculation of Fair Rate of Return
 
 9
 Petitioners, who purchase electricity from the Company at wholesale rates, argued before the Commission that because the business risks associated with wholesale provision of power to municipal customers are lower than those associated with retail sale to business or residential customers, the Company's rate of return on sales to petitioners should be set at a lower rate. That rate of return would, in turn, be reflected in lower rates for wholesale customers.
 
 
 10
 The Commission, expressing a desire to avoid further complication of the already intricate inquiry into the Company's allocation of costs among classes of customers, declined to inquire into differential risks. We in turn decline to substitute our judgment for that of the Commission. The Commission explicitly found (J.A. at 135) that the likelihood of discovering any significant risk differential was insufficient to justify the further inquiry sought by petitioners. We respect that determination by an agency familiar with the industry involved.[4]
 
 
 11
 3. Rejection of "roll-in" of subtransmission costs
 
 
 12
 Petitioners contend that the Commission erred in treating certain costs associated with the supplying of wholesale power (the costs of subtransmission lines) separately from the costs of supplying power generally. In industry parlance, the Commission declined to "roll" subtransmission costs into the costs of transmission. As a consequence, wholesale customers are required to bear subtransmission costs which if rolled in would be spread among all of the utility's customers. We affirm the Commission's decision.
 
 
 13
 Central to petitioners' claim that subtransmission costs should have been rolled in is the contention that all users of the Company's power network benefit from the existence of the subtransmission system that links petitioners to the main 115 kV system. If all customers benefit from these lower-voltage systems, petitioners assert, then the cost of those systems should be allocated accordingly.
 
 
 14
 The Commission relies heavily upon evidence in a prior proceeding, Minnesota Power & Light Co., 24 Pub.Util.Rep. 4th (PUR) 566 (1978) ("Opinion 12"), which it argues disproves petitioners' contention regarding the benefits of the subtransmission system. The parties dispute whether that earlier proceeding did in fact consider the precise issue here. Petitioners claim it discussed unrelated roll-in questions, Petitioners' Br. at 43-45, while the Commission claims that the question there involved was the same one raised here. Commission Br. at 29-30.
 
 
 15
 We find it unnecessary to decide whether Opinion 12 did in fact determine the technical questions going to the benefits of the subtransmission system urged by petitioners, because in any event there was sufficient evidence taken in this proceeding to support independently the Commission's conclusion. The ALJ in docket number ER77-427 heard testimony to the effect that subtransmission lines did not and physically could not benefit users other than the municipal customers supplied thereby. See J.A. 273 and portions of transcript there cited. The Commission made reference to this testimony as well as to Opinion 12 in reaching its final decision. J.A. 295. Therefore, the Administrative Procedure Act's requirement of "findings and conclusions," 5 U.S.C. Sec. 557(c) (1976), has been satisfied. Since the Commission's decision is supported by substantial evidence, our review of its determination need proceed no further.
 
 
 16
 4. Rejection of petitioners' "lead-lag" study
 
 
 17
 Finally, petitioners challenge the Commission's decision to permit the Company to claim a working capital allowance equal to 45 days of operating and maintenance expenses. Petitioners proffered to the Commission a study which purported to demonstrate that the Company's working capital needs did not require such an allowance because customers actually paid their bills promptly enough to cover the expenses attributed by the Company to delays in payment. The Commission rejected petitioners' study. Because we find no justification in the record for not crediting that study, we reverse the Commission's determination as to the working capital allowance, and remand the case for further proceedings with respect to this issue.
 
 
 18
 Prior to 1979, it had been the Commission's practice for at least 40 years to permit electric utilities a 45-day allowance. Interstate Power Co., 2 F.P.C. 71 (1939). In 1979, the Commission announced its intention to reexamine the 45-day formula. 44 Fed.Reg. 33410 (June 11, 1979). The Commission also announced that pending adoption of any new or revised working capital allowance formula, it would adhere to the 45-day formula, but would allow any party to submit a lead-lag study of the involved utility's particular payment experience that would form the basis for determining a different allowance. Carolina Power & Light Company, 17 Fed.Power Serv. (MB) 5-141 (1979). Petitioners submitted such a study of the Company's billing and receipt experience, which concluded that the Company was entitled to no working capital allowance because the Company's experience resulted in a "net lead"--i.e., its expenses were more than timely met by its early and on-time receipts from customers.
 
 
 19
 The Commission rejected petitioners' study and applied the 45-day formula. The Commission found the study deficient because it did not use actual lead and lag figures, but instead took "payment due" dates as one endpoint in the calculation of leads and lags, on the assumption that payments generally are received on or before the date they become due. According to the Commission, this reliance upon an assumption about payment practices rendered the study "unreliable." Petitioners' evidence, however, indicated that the assumption about payment practices had in fact been checked against actual practice and found correct. J.A. at 185. We agree with petitioners that the Commission improperly disregarded this fact.
 
 
 20
 The Commission's defense of its decision rests upon a formalistic argument that flies in the face of logic:
 
 
 21
 Admittedly, Petitioner's witness checked his assumption, that the "due" dates were representative of the actual payment dates, against evidence of the actual payment practices of the resale customer class (R. A759), but the fact remains that the witness did not use actual payment dates in the calculations in the study. Thus, the revenue lag figures in the study were, in the end, only estimates or approximations.
 
 
 22
 Commission Br. at 22. It is obvious that where a valid inference produces a certain conclusion, and only one of the premises of the inference is in doubt, a demonstration of the correctness of that premise suffices to prove that the conclusion is sound. Here, petitioners conducted a study based upon the assumption that payments were received on time. Then, as the Commission concedes, petitioners verified that assumption by checking the correctness of their data with the "evidence of the actual payment practices." Id. Such proof of the assumption's soundness necessarily gives the study the same credence as if it had been based originally upon data derived from actual payments.
 
 
 23
 The Commission points to no evidence tending to undermine the study's validity. One of the two ALJs who heard the initial presentations in this case upheld the study's validity; the Commission in Opinion 87 reversed that finding on the basis of its Opinion 86, which affirmed the rejection of the study by the other ALJ. See J.A. at 292-93. However, in Opinion 86 the Commission explicitly disavowed the ALJ's reasons for rejecting the study, and relied entirely upon the erroneous methodological objection noted above. See J.A. at 119. The Commission has therefore never articulated any legitimate basis for rejecting the study that its own procedures originally invited.
 
 
 24
 In these circumstances, petitioners are entitled either to have their lead-lag study accepted as the basis for the calculation of the appropriate working capital allowance or to an articulation of valid methodological reasons for its rejection. These cases are therefore remanded to the Commission for further proceedings consistent with this opinion on the question of the appropriate working capital allowance.
 
 
 25
 Judgment accordingly.
 
 
 
 [1]
 The city of Aitkin, Minnesota did not petition for review in No. 2376
 
 
 [2]
 Minnesota Power & Light Co., 20 F.P.S. 5-874 (1980) ("Opinion 86"); Minnesota Power & Light Co., 20 F.P.S. 5-898 (1980) ("Opinion 87")
 
 
 [3]
 Because we hold that the parties had actual notice of the changes, we do not pass upon the Commission's argument that section 302(b) does not require that disclosure of depreciation rate changes be made prior to a rate increase becoming effective
 
 
 [4]
 We are persuaded by the Commission that its practice of calculating risk differentials in other contexts, e.g., the natural gas industry, is not indicative of its ability or obligation to do so in the case of electric power industry. The fact, not contested by petitioners, that the natural gas industry is relatively unintegrated in comparison to the electric industry renders the attempted analogy between the two unconvincing